# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3675
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Terry Terrell Samuels, also known | * | |
| as T.G., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 10, 2008
Filed: October 9, 2008
_____

Before SMITH, BOWMAN, and GRUENDER, Circuit Judges.
_____

BOWMAN, Circuit Judge.

    Terry Terrell Samuels was convicted after a jury trial on both counts of a two-count indictment charging him with distribution of cocaine base (crack cocaine) within 1000 feet of an elementary school, 21 U.S.C. §§ 841(a)(1), 860(a). The District Court[1] sentenced him to a statutory life term of imprisonment, id. § 841(b)(1)(A). He appeals his convictions and his sentence. We affirm.

___

    [1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

We relate the facts in the light most favorable to the jury's finding of guilt. United States v. Davis, 260 F.3d 965, 967 (8th Cir. 2001), cert. denied, 534 U.S. 1107 (2002). In early 2006, Travis Rogers had been contacting Samuels, also known to Rogers as "T.G.," about three times a week to purchase crack cocaine. About seventy-five percent of the time, someone other than Samuels would show up to actually make the exchange of drugs for cash. In March of 2006, Rogers became a confidential informant (CI) and worked with law enforcement to set up controlled buys of cocaine base from Samuels. On March 24, 2006, Rogers purchased 20.24 grams of cocaine base from Samuels for $750. The transaction took place in the entryway of Rogers's apartment building in Dubuque, Iowa, which was within 1000 feet of Prescott Elementary School. Samuels arrived at Rogers's apartment building alone in a white Dodge Charger. On March 28, 2006, Samuels again drove to Rogers's apartment building in a white Charger, but sent an unidentified male into the building to exchange 19.35 grams of cocaine base for $750. On both occasions, Rogers wore a wire and law enforcement recorded the transactions. Shortly before each controlled buy, Rogers called Samuels at the same telephone number; those calls were recorded by law enforcement as well. And immediately before Samuels arrived for the March 28 transaction, Samuels called Rogers. The wire that Rogers was wearing recorded Rogers's side of the conversation but not Samuels's. Both of the controlled buys were also observed by law enforcement officers, although the officers could not see into the apartment building. These sales are the basis for Samuels's convictions on the two counts of distribution.

For his first issue on appeal, Samuels contends that the District Court erred in denying his pretrial ex parte request for authorization to pay a voice comparison expert more than the maximum allowed by statute. See 18 U.S.C. § 3006A(e). The expert would have compared Samuels's voice with the voice of the person who gave Rogers the cocaine base in exchange for cash on March 28 and then would have made a judgment as to whether it was in fact Samuels's voice on the recording made by law

enforcement.[2] After a hearing, the court determined that Samuels had not met his burden to show the court both that the expert's analysis was "necessary to an adequate defense" and that Samuels's trial would be unfair if the employment of his expert was not approved. United States v. Mentzos, 462 F.3d 830, 839 (8th Cir. 2006), cert. denied, 127 S. Ct. 2079 (2007). The court said that the voice analysis was unnecessary because there were other methods available to Samuels to show that he was not the speaker on the tape, for example, the testimony of someone who knew him and his voice. See United States v. Thurmon, 413 F.3d 752, 756 (8th Cir.), cert. denied, 546 U.S. 1069 (2005). The court also doubted that a voice comparison analysis would result in admissible evidence. On appeal, we will reverse only if we decide that the court abused its discretion, and we can make such a determination only if Samuels shows that he was prejudiced by the denial of his request. See Mentzos, 462 F.3d at 840.

We do not address the admissibility of any evidence that may have resulted from the proposed expert's analysis because we conclude that the District Court did not err in determining that Samuels failed to show that a voice analysis of the March 28 wire recording of the controlled buy was necessary for his defense. As the court noted, there were other methods to show that Samuels's was not the voice on the recording. Moreover, the recordings of both transactions were played for the jurors during trial, and they could judge for themselves if the voices were the same. In any event, with the benefit of hindsight, we can say with confidence that Samuels was not prejudiced by the absence of an expert's voice-comparison opinion. When Rogers was

---

[2]Samuels claims that the recording of the March 28 transaction "was selected because it is the alleged seller's conversation on audiotape that is the longest and consequently the most likely to be amenable to voice comparison." Br. of Appellant at 25–26. We have listened to the recorded transactions for both the March 24 and the March 28 controlled buys and conclude that Samuels's characterization is wrong. On the March 24 recording, the seller speaks longer, louder, and more clearly than on the March 28 recording.

-3-

called as a witness at trial, he apparently changed his expected testimony and said that although he had spoken to Samuels twice by telephone just before the March 28 sale, Samuels sent another individual into Rogers's apartment building to turn over the crack and collect the cash (as he had in the past, before Rogers became a CI). Rogers—the only eyewitness to the actual exchange of money for drugs as it was being recorded (besides the person who took the cash and gave Rogers the crack)—testified that the voice on the March 28 recording of the controlled buy did not belong to Samuels. Given that testimony, "the facts do not reasonably suggest" that it *was* Samuels's voice on the wire recording, so the jury did not need the opinion of an expert that it *was not* Samuels's voice. Thurmon, 413 F.3d at 756. Samuels makes much of the fact that Rogers's exculpatory trial testimony on this point had changed from Rogers's previous inculpatory sworn statements (that Samuels himself had handed Rogers the crack cocaine on March 28), but that does not make an expert opinion that the voice was not Samuels's necessary to his defense. We hold that the District Court did not abuse its discretion in denying Samuels's request to authorize funds to pay an expert more than the maximum allowed by statute.

Samuels next argues that the District Court abused its discretion when it denied portions of his motion in limine. See United States v. Benitez, 531 F.3d 711, 716 (8th Cir. 2008) (standard of review). The court granted the motion in part but denied it as to the testimony of two cooperating witnesses, Rogers and Donald Harris, and as to evidence of the fact of Samuels's 1998 Illinois state-court conviction for delivery of marijuana. Samuels argues that allowing this evidence at trial violated the dictates of Rules 403 and 404(b) of the Federal Rules of Evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Likewise, evidence of other crimes or acts will not be admissible under Rule 404(b) "to prove the character of a person in order to show action in conformity therewith." But "Rule 404(b) is a rule of inclusion rather than exclusion, rendering admissible evidence of other crimes relevant to any issue at trial other than an accused's criminal disposition." Benitez, 531 F.3d at 716. The Rule

-4-

allows the admission of evidence of other crimes or acts to prove intent, knowledge, and identity, all of which are relevant here, where Samuels denied that he was the person who sold Rogers the cocaine base.

As for the testimony of the cooperating witnesses, Samuels contends that the "sheer volume" of drug deals testified to by Rogers and Harris "invited" the jury to use that testimony to determine that Samuels was guilty of the similar conduct with which he was actually charged. Br. of Appellant at 28. But as the District Court pointed out, Rogers was the CI for the charges for which Samuels was on trial, and his testimony about the crack cocaine deals he had done with Samuels in the weeks leading up to March 2006 was highly relevant to show Samuels's intent, knowledge, and identity and was not unfairly prejudicial. And Harris testified to conducting crack deals with Samuels that followed the pattern Rogers described in his testimony. In early 2006, before the controlled buys with Rogers, Samuels delivered crack cocaine to Harris's residence, occasionally sending someone else to make the actual cash-for-crack exchange. This was relevant and highly probative evidence, again of Samuels's intent, knowledge, and identity, and was not unfairly prejudicial. While both Rogers and Harris testified to a number of drug deals with Samuels, all of the deals occurred during a limited time frame close in time to the controlled buys, and both witnesses described transactions that took place in a manner strikingly similar to that of the crimes charged.

Samuels also argues that evidence of his state-court marijuana conviction should not have been admitted. According to Samuels, the January 1998 conviction for delivery of marijuana in December 1996 was so remote in time from the March 2006 charged conduct that it was not relevant, lacked probative value, and constituted excludable other-crimes evidence. Although the 1998 delivery conviction was for a crime that occurred over nine years before the conduct charged in the indictment, that crime was functionally similar to the charged conduct and was relevant to show Samuels's intent, knowledge, and identity for the two counts of conviction. Cf. United

-5-

States v. Cook, 454 F.3d 938, 941 (8th Cir. 2006). The illegal substance was not the same, but that is of no consequence. See id.; see also Benitez, 531 F.3d at 716. Moreover, the government proposed to prove only the fact of conviction, either by confronting Samuels, if he testified, or by offering a certified copy of the conviction.[3] Both of these are straightforward methods of proof that are less prejudicial than, for example, police reports (which could contain hearsay) or witness testimony (which could result in mini-trials of old crimes). See Cook, 454 F.3d at 942.

In addition, we note that after the introduction of the other crimes evidence at Samuels's trial, the District Court gave specific cautionary instructions advising the jury that the evidence could not be used to prove the crimes charged and could be considered only if proved by a preponderance of the evidence. Had there been any unfair prejudice to Samuels, it would have been offset by the limiting instructions. See United States v. Edelmann, 458 F.3d 791, 810 (8th Cir. 2006); United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006).

In sum, the evidence was offered for a proper purpose, it was relevant, its probative value was not outweighed by the potential for unfair prejudice, and the court gave cautionary instructions. See Huddleston v. United States, 485 U.S. 681, 691–92 (1988). In these circumstances, we cannot say that the District Court abused its discretion in denying Samuels's motion in limine as to these matters.

For his next issue, Samuels appeals the District Court's denial of his Batson[4] challenge to the government's peremptory exclusion of two jurors from the venire. Samuels argues that the two were removed because they were African-American, as is Samuels. When counsel raised the challenge during jury selection, the District

---

[3] Samuels ultimately stipulated to the fact of conviction.

[4] Batson v. Kentucky, 476 U.S. 79 (1986).

Case 2:06-cr-01020-LRR-MAR   Document 90   Filed 10/10/08   Page 6 of 12

Court[5] conducted the necessary inquiry and found that the strikes were not racially motivated. We review the District Court's determination concerning discriminatory intent—a question of fact—for clear error. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

At the point in jury selection where the government and Samuels were to exercise their peremptory challenges, three African-Americans remained on the venire. The government struck two of them, Starks and Vanarsdale. Samuels objected. The District Court first determined that Samuels had made a prima facie showing that the government excluded Starks on the basis of his race and assumed that the prima facie case was made as to Vanarsdale.[6] See Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008) (articulating the three-step process to be followed in the event of a Batson challenge).

At this point, the burden shifted to the government to offer race-neutral reasons for striking both. "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 767–68 (1995) (per curiam)). As for Starks, the Assistant United States Attorney (AUSA) noted the prospective juror's concern that the judicial system treated his nephew unfairly because the nephew was African-American. According to Starks, his nephew was charged with a felony offense and was "railroaded" into taking a plea bargain to avoid a lengthy sentence. Jury Selection Tr. at 55. On his juror

---

[5] With Samuels's consent, the Honorable Jon S. Scoles, United States Magistrate Judge for the Northern District of Iowa, presided over jury selection.

[6] When challenged for the strike, the Assistant United States Attorney professed his subjective belief that Vanarsdale was white, and the court was uncertain. Jury Selection Tr. at 75–76. A record was later made that Vanarsdale's father is African-American.

-7-

questionnaire, Starks also said that he believed the justice system does not treat African-Americans fairly. During voir dire, Starks said that the government needed to have "overwhelming" evidence to prove its case. Id. at 54. The AUSA's concerns regarding Vanarsdale were his friendship with Starks, the fact that he had previously served on a jury that had returned a split verdict, a question Vanarsdale asked during voir dire about circumstantial evidence and a hypothetical vehicle stop by police, and Vanarsdale's "demeanor." Id. at 77. The AUSA also mentioned Vanarsdale's comment that his uncle overdosed on drugs and that he has friends and family who use drugs but "it's their choice." Id. at 85.

The court then found that Samuels had failed to meet his burden to show purposeful discrimination on the part of the government. See Rice, 546 U.S. at 338 (noting that burden of persuasion on this point is the defendant's). "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility . . . ." Snyder, 128 S. Ct. at 1208. And where, as here, demeanor is mentioned as a reason for striking a prospective juror, "the trial court's first-hand observations [are] of even greater importance." Id. The reasons the AUSA gave for striking Starks may be stronger than those he gave for striking Vanarsdale, but none of the reasons shows purposeful discrimination on the part of the government. Samuels's argument that defense counsel rehabilitated these veniremen on several of the problems noted by the AUSA is of no avail. These were not challenges for cause, where a juror may be rehabilitated and remain on the venire, but were peremptory challenges, where rehabilitation does not preclude the strikes. See White v. Luebbers, 307 F.3d 722, 728 (8th Cir. 2002) (noting that the government could exercise a peremptory challenge to excuse a potential juror who could not be removed for cause after he had been rehabilitated by the defense), cert. denied, 538 U.S. 981 (2003); see also Batson v. Kentucky, 476 U.S. 79, 97 (1986) ("[T]he prosecutor's explanation [for a peremptory strike] need not rise to the level justifying exercise of a challenge for cause."). The AUSA's explanations in this case were neither unreasonable nor improbable. See

-8-

Miller-El, 537 U.S. at 339. We conclude that the District Court did not clearly err in denying Samuels's Batson challenge.

For his next issue, Samuels argues that the District Court erred in denying his motion for judgment of acquittal or, in the alternative, a new trial. This is essentially a sufficiency-of-the-evidence challenge, with Samuels pointing out the following problems with the evidence—or lack thereof—at trial.

The government presented no evidence of the ownership of the Dodge Charger in which Samuels arrived at Rogers's apartment building for the controlled buys and no evidence of the identity of the account holder for the telephone number at which Rogers reached Samuels. Also, law enforcement did not follow up on its request for fingerprint analysis of the drug packaging, so there was no fingerprint evidence at trial. Law enforcement took no photographs of the drug transactions, and the identification of Samuels made by the officers after the controlled buys was suspect because "the photograph that they based their identification on was obtained as a result of a misidentification of Mr. Samuels on an earlier occasion." Br. of Appellant at 35. The visual identification also was tainted because Samuels was wearing a hat, the officers were in a moving car and the suspect was moving when they identified him as Samuels, the visuals were brief, and the identifications were cross-racial. Because the actual transactions took place inside the foyer of Rogers's apartment building, the surveilling officers did not see the exchanges take place, and no one on the recordings mentioned drugs. Finally, key government witnesses Rogers and Harris were not credible, as they were both criminals themselves and Rogers had told conflicting stories about the identity of the person who actually handed over the crack cocaine in the second controlled buy.

We review the denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the verdict. United States v. Coplen, 533 F.3d 929, 931 (8th Cir. 2008). We have reviewed the transcript of Samuels's trial and

-9-

Case 2:06-cr-01020-LRR-MAR    Document 90    Filed 10/10/08    Page 9 of 12

Miller-El, 537 U.S. at 339. We conclude that the District Court did not clearly err in denying Samuels's Batson challenge.

For his next issue, Samuels argues that the District Court erred in denying his motion for judgment of acquittal or, in the alternative, a new trial. This is essentially a sufficiency-of-the-evidence challenge, with Samuels pointing out the following problems with the evidence—or lack thereof—at trial.

The government presented no evidence of the ownership of the Dodge Charger in which Samuels arrived at Rogers's apartment building for the controlled buys and no evidence of the identity of the account holder for the telephone number at which Rogers reached Samuels. Also, law enforcement did not follow up on its request for fingerprint analysis of the drug packaging, so there was no fingerprint evidence at trial. Law enforcement took no photographs of the drug transactions, and the identification of Samuels made by the officers after the controlled buys was suspect because "the photograph that they based their identification on was obtained as a result of a misidentification of Mr. Samuels on an earlier occasion." Br. of Appellant at 35. The visual identification also was tainted because Samuels was wearing a hat, the officers were in a moving car and the suspect was moving when they identified him as Samuels, the visuals were brief, and the identifications were cross-racial. Because the actual transactions took place inside the foyer of Rogers's apartment building, the surveilling officers did not see the exchanges take place, and no one on the recordings mentioned drugs. Finally, key government witnesses Rogers and Harris were not credible, as they were both criminals themselves and Rogers had told conflicting stories about the identity of the person who actually handed over the crack cocaine in the second controlled buy.

We review the denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the verdict. United States v. Coplen, 533 F.3d 929, 931 (8th Cir. 2008). We have reviewed the transcript of Samuels's trial and

have determined that a rational jury "could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The missing evidence that Samuels identifies might have made the government's case stronger, but it was not necessary for proof beyond a reasonable doubt. And as this Court has said many times, questions concerning the credibility of witnesses, where their testimony is not incredible on its face, are for the jury to decide. See, e.g., Coplen, 533 F.3d at 931.

When faced with a motion for a new trial, unlike a motion for judgment of acquittal, a district court is permitted to weigh the evidence and judge witness credibility for itself in determining if there may have been a miscarriage of justice such that a new trial is required. United States v. Davis, 534 F.3d 903, 912 (8th Cir. 2008). We review the District Court's denial of Samuels's new-trial motion for abuse of discretion. Id. "Motions for new trials based on the weight of the evidence are generally disfavored." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). Samuels's argument regarding "[v]ery important evidence . . . not presented by the government" and the credibility of Rogers and Harris is no more compelling on the issue of a new trial than it was on the issue of judgment of acquittal. Br. of Appellant at 34.

In its order denying Samuels's motion for a new trial, the District Court reviewed in detail the case presented against Samuels at trial and found that the evidence of guilt for the crimes charged was "strong" and "exceed[ed] the standard for a new trial." Order of Aug. 30, 2007, at 15, 16. As noted above, Samuels argues that the evidence the government did *not* present and the credibility of its cooperating witnesses resulted in a verdict that should be overturned. But "the question is not what evidence the government did not have." Campos, 306 F.3d at 581. Instead, the court must evaluate the strength of the evidence that *was* presented. As for witness credibility, the District Court noted that in deciding the motion for a new trial, it could weigh the evidence and satisfy itself regarding witness credibility. We have no reason

to believe that the District Court did not apply these legal standards in determining that a new trial was not warranted based on the credibility of the cooperating witnesses. We cannot say that the District Court abused its discretion in denying Samuels's motion for a new trial.

Samuels also challenges the District Court's imposition of a statutory mandatory life sentence.[7] We review de novo the court's interpretation and application of the statute. United States v. McAtee, 481 F.3d 1099, 1105 (8th Cir. 2007).

Samuels argues that his "prior convictions for a felony drug offense," 21 U.S.C. § 841(b)(1)(A), were improperly used to enhance his sentence for two reasons. First, he challenges the convictions themselves, insisting that he did not commit the offenses to which he pleaded guilty and of which he was therefore convicted. This argument fails because the convictions in question occurred more than five years before the date of the information that set out the notice of intent to seek enhanced penalties and because Samuels does not now claim that he was denied the right to counsel when convicted. See United States v. Rounsavall, 115 F.3d 561, 566 (8th Cir.), cert. denied, 522 U.S. 903 (1997); see also 21 U.S.C. § 851(e).

Samuels also argues that the convictions in question should be counted as a single offense. The previous crimes were possession of crack cocaine on September 4, 1994, for which Samuels was convicted and sentenced to probation on April 25, 1996; possession of crack cocaine on February 20, 1995, for which Samuels was convicted and sentenced to prison on April 25, 1996; and delivery of marijuana on December 31, 1996 (after Samuels's release from prison on the second crack

---

[7]It is confusing at times as to whether Samuels is challenging his status as a career offender under Chapter 4 of the Sentencing Guidelines (Criminal History) or his status as a drug offender with two prior felony drug convictions under 21 U.S.C. § 841. Where the distinction matters, we have given Samuels the benefit of the doubt when considering his sentencing issues.

-11-

cocaine charge), for which Samuels was convicted and sentenced to probation on January 26, 1998. We reject Samuels's argument that these three convictions "constitute a single criminal episode." Br. of Appellant at 39. The crimes occurred at least months and at most over two years apart and "required separate planning and execution." McAtee, 481 F.3d at 1105 (quoting United States v. Gray, 152 F.3d 816, 821 (8th Cir. 1998), cert. denied, 525 U.S. 1169 (1999)). Two of the crimes involved crack cocaine, one involved marijuana; two were for possession, one was for delivery; and as Samuels acknowledges, they were all separated by intervening arrests and the last two were separated by time served in prison. They do not become a single offense, as Samuels maintains, merely because they all involved small amounts of controlled substances and all occurred in Chicago.

Samuels also argues that the state-law possession offenses would be misdemeanors, not felonies, under federal law and so cannot be used to sentence him to a statutory mandatory life sentence. In support of this argument, he cites the Supreme Court's opinion in Lopez v. Gonzales, 127 S. Ct. 625 (2006), where the Court discussed the meaning of a "felony punishable under the Controlled Substances Act" in an immigration removal case. But "felony drug offense" for purposes of statutory enhancement under § 841(b)(1) is defined by 21 U.S.C. § 802(44) as "an offense that is punishable by imprisonment for more than one year" under any federal *or state law*. Samuels's argument therefore fails.

It appears that Samuels also makes a Sentencing Guidelines "reasonableness" challenge, claiming that "the district court erred in enhancing his sentence as a career offender." Br. of Appellant at 39. This argument is without merit. The District Court sentenced Samuels to life in prison as required by § 841(b)(1), not as a career offender under the Guidelines. In this situation, "reasonableness" under the Guidelines is not implicated. See United States v. Gregg, 451 F.3d 930, 937 (8th Cir. 2006).

We affirm Samuels's convictions and sentence.

_____

-12-