# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> TERRY TERRELL SAMUELS, <br><br> Defendant. | No. 06-CR-1020-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.   INTRODUCTION

This matter is before the Court on defendant's motion for compassionate release. (Doc. 144). The government timely filed a resistance. (Doc. 149). Defendant timely filed a reply. (Doc. 150). For the following reasons, the Court **states that it would grant defendant's motion** if this case were remanded from the Eighth Circuit Court of Appeals and if defendant elaborates on his release plan.

## II.   RELEVANT BACKGROUND

Throughout the first few months of 2006, defendant sold significant quantities of cocaine base to at least five people. (Doc. 69, at 5–7). Defendant often delivered the cocaine base through another person and some of the cocaine base sold by defendant was later resold by its purchaser to others. (*Id.*). In late March 2006, defendant sold cocaine base to a confidential informant on three occasions. (*Id.*).[1] Some of these transactions took place at a residence that was within 1,000 feet of an elementary school. (*Id.*). In total, defendant was held responsible for 257.39 grams of cocaine base. (*Id.*, at 7).

---

[1] Defendant chides the confidential informant in his motion. (Doc. 144, at 2). The Court finds his criticisms irrelevant.

On May 25, 2006, a grand jury issued an Indictment charging defendant with two counts of distributing cocaine base within 1,000 feet of an elementary school in violation of Title 21, United States Code, Sections 841(a)(1), 860(a), and 841(b)(1)(B). (Doc. 1). On June 19, 2007, a jury found defendant guilty on both counts. (Doc. 51).

On November 9, 2007, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 69). Defendant was, at that time, 33 years old. (*Id.*, at 2). Defendant's mother was a teacher, and his father was never present in his life. (*Id.*, at 16). Defendant's mother remarried when he was young and, as a result, defendant has six half-siblings, none of whom were known to have substance abuse issues or criminal histories. (*Id.*, at 16–17). Defendant grew up in an area of Chicago that was "characterized by violence and drugs," but he was apparently not involved in such activities as a child due in part to his mother's guidance. (*Id.*, at 17). Records indicate defendant was at some point affiliated with a gang. (*Id.*). Defendant's mother also noted that defendant suffered from learning disabilities and asthma as a child. (*Id.*). Defendant was enrolled in special education courses and ultimately dropped out of school mid-way through the twelfth grade reportedly due to violence at the school. (*Id.*, at 20). Defendant had three children by three different women. (*Id.*, at 17–18). Defendant had a stable but unverified work history, most recently working as an independent contractor for a road moving business. (*Id.*, at 21).

Defendant had long suffered from asthma and still experienced asthmatic symptoms, although to a lesser extent than when he was a child. (*Id.*, at 18). He had partial diabetes. (*Id.*). Defendant was also on medication for his high blood pressure. (*Id.*, at 19). He was also treated for a gunshot wound to his leg. (*Id.*). Defendant had no history of mental health issues but did receive disability payments due to his learning disabilities, memory deficiencies, and asthma. (*Id.*). Defendant was a weekly user of marijuana but had no other substance abuse issues. (*Id.*, at 19–20).

2

Defendant's criminal history was significant with four prior drug-related convictions and two offenses involving firearms. Defendant's non-drug-related convictions were comprised of carrying a concealed weapon (for having an unloaded firearm in the backseat of his car), disorderly conduct (for "pull[ing] away" and "physically oppos[ing]" an officer after a stun gun was found beneath a passenger's seat in his car), and obstructing an officer (for providing a false name to an officer). (*Id.*, at 10–13). His drug-related convictions were comprised of possession of cocaine base twice (both involving defendant possessing a packet containing smaller baggies of cocaine base), delivering marijuana (also involving possession of a large bag containing smaller bags of marijuana), and delivering cocaine and aggravated unlawful use of a weapon (wherein defendant was observed selling cocaine base, found in possession of multiple small baggies of cocaine base and a handgun, and ran from officers). (*Id.*, at 11–13). It appears many of defendant's offenses occurred while he was on probation or some form of supervision. (*Id.*, at 10–13). Defendant's performance on probation was mixed, sometimes completing his term "satisfactorily," sometimes "unsatisfactorily." (*Id.*). Prior to the instant offense, defendant had only been incarcerated one time for six months with the rest of his offenses resulting in either fines or terms of probation. (*Id.*).

On November 14, 2007, the Court sentenced defendant. (Doc. 71). Defendant was found to be an organizer, leader, manager, or supervisor of the criminal activity. (Doc. 69, at 9). He did not receive a reduction in his offense level for acceptance of responsibility because he proceeded to trial. (*Id.*). Defendant, as a career offender, was in criminal history category VI with a total offense level of 37, yielding an advisory guideline range of imprisonment of 360 months to life imprisonment followed by ten years to life on supervised release on both counts. (*Id.*, at 23). Both convictions carried a mandatory term of life imprisonment. (*Id.*). The Court sentenced defendant to life imprisonment followed by ten years on supervised release on both counts to run

3

concurrently. (Doc. 72). Defendant appealed his conviction and sentence but was unsuccessful. (Docs. 73, 91, 100, & 105). His motions under Title 28, United States Code, Section 2255 were also unsuccessful. *See* (Doc. 144, at 4).

Since sentencing, the Court has sua sponte declined to reduce defendant's sentence three times. (Docs. 94, 109, & 112). On January 11, 2019, defendant filed a motion to reduce his sentence under the First Step Act. (Docs. 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 128, & 133). On June 25, 2020, the Court denied the motion. (Doc. 134). On July 8, 2020, defendant appealed the Court's denial (Doc. 136), and his appeal is still pending before the Eighth Circuit Court of Appeals.

On November 4, 2020, defendant filed a pro se motion for compassionate release. (Doc. 140). On December 9, 2020, defendant filed his motion for compassionate release now before the Court with the assistance of counsel. (Doc. 144). Defendant is currently incarcerated at Pekin FCI.[2]

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons ("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Although some courts disagree, this Court holds that defendants are not required to administratively appeal a warden's denial and may satisfy Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion for compassionate release

---

[2] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

in the courts. *United States v. Burnside*, 467 F. Supp. 3d 659, 667 (N.D. Iowa 2020) (compiling cases).

The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

United States Sentencing Guidelines ("USSG") Section 1B1.13 defines "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Section 1B1.13 provides that such reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; or (5) is experiencing some other extraordinary and compelling reason as determined by the BOP.

5

Although some courts disagree, this Court holds that Section 1B1.13 is not binding because it predates the First Step Act of 2018's amendments to Section 3582(c)(1)(A) which enabled defendants to bring motions for compassionate release on their own behalf. *United States v. Crandall*, No. 89-CR-21-CJW-MAR, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020). The Court recognizes, however, that Section 1B1.13 should still be considered a helpful guidepost in determining whether extraordinary and compelling reasons exist to release a defendant. *Id.*

### IV. DISCUSSION

#### A. Exhaustion of Administrative Remedies

Defendant submitted a request for release to his warden on August 27, 2020. (Doc. 140-1, at 9–12). On October 1, 2020, the warden denied defendant's request. (Doc. 144-1). In light of these facts, the Court finds defendant has fulfilled the exhaustion requirement of 3582(c)(1)(A) because 30 days have lapsed from the date the warden of his facility received his request. *See Burnside*, 467 F. Supp. 3d at 667.

#### B. Extraordinary and Compelling Reason

Defendant argues an extraordinary and compelling reason for release is present for two reasons: (1) his health conditions put him at a high risk of severe outcomes if he contracts COVID-19; and (2) he would no longer be subject to a mandatory life sentence and would have a different advisory guideline range if sentenced today. (Doc. 144, at 6–7). The Court will address both grounds for release in turn.

##### 1. Health Conditions During the COVID-19 Pandemic

Defendant cites his type II diabetes, obesity, hypertension, asthma, and sleep apnea as placing him at a substantially higher risk of severe outcomes from COVID-19. (*Id.*, at 8–9). The government concedes that defendant's health conditions could support a finding of extraordinary and compelling circumstances here. (Doc. 149, at 14–15).

6

Currently, 102 inmates and 11 staff persons are positive for COVID-19 at Pekin FCI, another 699 inmates and 56 staff have recovered, and no one from either group has died.[3]

The COVID-19 pandemic can constitute an extraordinary and compelling reason for compassionate release if the defendant is at a substantially greater risk of severe outcomes from COVID-19 due to age or underlying health conditions. *See Burnside*, 467 F. Supp. 3d at 668 (compiling cases). The Centers for Disease Control and Prevention ("CDC") recognizes that people with type II diabetes or a body mass index ("BMI") in excess of 30 are at an increased risk of severe outcomes from COVID-19.[4] The CDC also recognizes hypertension and asthma as potential risk factors. *Id*. The CDC does not recognize sleep apnea as an actual or potential risk factor. A person's risk to COVID-19 also increases with age.[5] Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id*. Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id*.

Defendant recently turned 47 years' old. (Doc. 69, at 2). Thus, although the Court notes his age, he is not in or near being in a high-risk age group.

As to defendant's cited health conditions, the Court has scant information beyond his diagnoses. Defendant's medical records show that he has been a Care Level 2 inmate since 2014. (Doc. 140-1, at 25). He has had type II diabetes since 2008. (*Id.*, at 2). Because the CDC recognizes type II diabetes as a risk factor, the Court affords this condition substantial weight in its analysis.

---

[3] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

[4] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 29, 2020).

[5] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Dec. 13, 2020).

7

Defendant has been classified as morbidly obese since 2010. (*Id.*). Defendant does not identify his current weight or BMI. A diagnosis of morbid obesity implies his BMI exceeds 40.[6] His BMI at the time of sentencing was 43.8. (Doc. 69, at 2) (containing defendant's height and weight).[7] In any event, it appears his BMI is significantly above the CDC's risk-threshold. Thus, defendant's morbid obesity is a risk factor and the Court affords this condition substantial weight in its analysis.

Defendant was diagnosed with hypertension in 2008 and remains hypertensive. (Doc. 140-1, at 2). Defendant, without citation, states that he takes several blood pressure medications and that his most recent blood pressure reading was 140/83, placing him in hypertension stage 2. (Doc. 144, at 9).[8] Because hypertension is only noted as a potential risk factor, the Court has generally only considered this if the defendant's hypertension is consistent and severe. *See United States v. Clutts*, No. 18-CR-70-CJW-MAR, 2020 WL 6531915, at *6 (N.D. Iowa Nov. 5, 2020). Here, defendant has long suffered from hypertension, but the Court does not have enough verifiable information to find that his hypertension is severe. On balance, the Court affords this condition significant, but not substantial, weight in its analysis.

Defendant's asthma has fluctuated over the years but has been marked as current since 2014. (Doc. 140-1, at 2). Again, the severity of defendant's asthma is unclear

---

[6] *What is Morbid Obesity?*, University of Rochester Medical Center, https://www.urmc.rochester.edu/highland/bariatric-surgery-center/journey/morbid-obesity.aspx.

[7] *Calculate Your Body Mass Index*, National Heart, Lung, and Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[8] *Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

from the record provided. Given its duration, however, the Court again affords this condition significant, but not substantial, weight in its analysis.

Defendant has also suffered from sleep apnea since 2017. (*Id.*, at 2). Defendant states that he uses a CPAP device but does not provide any supporting citation. (Doc. 144, at 9). Because sleep apnea is not recognized by the CDC as being relevant to COVID-19 but has some facial relevance to a defendant's ability to breath, the Court has given this condition some minor weight in its analysis if it is particularly obstructive. *United States v. Wilson*, No. 15-CR-2014-CJW-MAR, 2020 WL 6785109, at *3 (N.D. Iowa Nov. 18, 2020). The Court does not have enough verifiable information to conclude that defendant's sleep apnea is particularly obstructive. Thus, the Court affords this condition little to no weight in its analysis.

Although the Court is troubled by the overall lack of information provided about the specifics of defendant's cited health conditions, there is sufficient information in the record to find that defendant is at a substantially higher risk of severe outcomes if he contracts COVID-19. *See United States v. Wilson*, No. 13-CR-2011-CJW-MAR, 2020 WL 5894193, at *6 (N.D. Iowa Oct. 5, 2020) (finding the defendant's diabetes, mild obesity, hypertension, and chronic kidney disease substantially elevated his risk to COVID-19). He has two health conditions which are known to increase his risk (type II diabetes and morbid obesity) and two health conditions which may increase his risk (hypertension and asthma). Given these conditions and the status of the virus at his facility, defendant faces a significant risk of both contracting COVID-19 and experiencing severe outcomes. Such risk, under these circumstances, constitutes an extraordinary and compelling reason for release.

### 2. *Non-Retroactive Changes in the Law*

Defendant next argues that non-retroactive changes in the law effectively make his sentence unjust and thus constitute an extraordinary and compelling reason for release.

9

(Doc. 144, at 12–17). Defendant notes that if he were sentenced today, he would not be subject to a mandatory term of life imprisonment and that his advisory guideline range would be lower. (*Id.*). Defendant argues that the Court is not precluded from considering these disparities by any applicable policy statement. (*Id.*, at 18–19).

The Court rejected this argument in *United States v. Crandall*, 2020 WL 7080309, at *6–8.[9] "[T]he Court finds it improper to effectively make non-retroactive changes in the law retroactive by deeming them to be extraordinary and compelling circumstances. Such changes are not the personal, individualized circumstances generally contemplated by Section 1B1.13." *Id.*, at *7. The Court sees no reason to revisit this argument and finds that there is no distinction here from *Crandall* on this issue. Thus, the Court finds that the mere fact that defendant would be subject to different sentencing parameters today is not itself an extraordinary and compelling reason for release.

In light of the Court's finding above, however, release may be warranted based on defendant's health conditions during the COVID-19 pandemic. The Court must still, however, consider whether release is appropriate under the Section 3553(a) factors.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just

---

[9] In his reply, defendant acknowledges this and merely asks that the Court consider these factors in its analysis of the Section 3553(a) factors. (Doc. 150, at 8–9).

10

punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The instant offense alone is serious, but not particularly aggravating. Defendant trafficked in significant quantities of cocaine base, sold drugs near a protected location, and enlisted others to assist him in the distribution of drugs. There is no evidence, however, that defendant carried a firearm during these transactions or that violence was involved in any way. What drove defendant's sentence here is his drug-related recidivism. Defendant has four prior convictions related to distributing drugs, three of them involving cocaine base. Despite successive terms of probation, defendant continued to engage in the exact same conduct, even escalating into possession of a firearm in his most recent prior conviction. A significant term of incarceration was certainly necessary to break defendant's undeterred pattern of selling drugs. Prior to the instant offense, he had only been incarcerated one time for six months.

To be sure, defendant committed all these offenses in his 20's, now more than two decades ago. (Doc. 69, at 10–13). His offenses were undoubtedly influenced by the rough area of Chicago he grew up in and potentially by his significant learning disabilities. His non-drug-related criminal history is relatively minor and non-violent.[10]

Significantly, despite his life sentence, defendant has performed well while incarcerated. He has taken a substantial amount of educational and vocational courses. (Doc. 144-2). He currently works as a barber and reportedly also worked as a suicide

---

[10] The Court recognizes that defendant has been arrested for other offenses, some of which were violent. (Doc. 69, at 14–16). Given that defendant was not convicted of these offenses, however, the Court declines to consider them.

companion. (Docs. 144, at 20; 144-2). He has had only five disciplinary reports, four of which are minor (absent from assignment, being unsanitary, unauthorized exchange of money, and phone abuse); his only significant report was for fighting with another person in May 2011. (Doc. 144-2, at 4). All his disciplinary reports occurred nearly a decade ago or longer. (*Id.*). In sum, it appears defendant has shown impressive and stable rehabilitation while incarcerated despite the prospect that he may never be released.

Although non-retroactive changes in the law do not themselves constitute an extraordinary and compelling reason for release, they are considered here because such changes speak to the potential sufficiency of the time the defendant has already served. *Crandall*, 2020 WL 7080309, at *7 n.9. By today's revised standards, defendant's advisory guideline range of imprisonment would be 262 to 327 months' imprisonment. (Doc. 144, at 14). Defendant argues that a sentence within this range would be greater than necessary to satisfy the goals of Section 3553(a). (*Id.*). At the time of sentencing, the Court certainly would have disagreed. Defendant's criminal history reflects a high degree of recidivism and an escalation in the seriousness of his criminal conduct. His criminal conduct in the federal offense involved a leadership role. He also did not accept responsibility by pleading guilty. Although defendant has a constitutional right to a criminal trial and was facing two mandatory life sentences, a plea agreement with the government might have enabled him to accept responsibility and avoid life imprisonment. Mitigating factors are also present here, such as defendant growing up in a neighborhood saturated with drugs and violence, defendant's significant learning disabilities, and the fact he had little in the way of incremental punishment preceding the instant offense. Thus, at sentencing, a bottom of the range sentence of 262 months (approximately 21.5 years) would have been warranted at the very least.

The Court does not take this decision involving a life-term inmate lightly. Indeed, it weighed the merits of arguments for similar life-term inmates at length in both *United States v. Green*, 06-CR-53-CJW-MAR, 2020 WL 3913498 (N.D. Iowa July 10, 2020) and *United States v. Smith*, No. 04-CR-2002-CJW-MAR, 2020 WL 3913482 (N.D. Iowa July 10, 2020). In *Green*, the Court denied release despite the defendant's dire health issues during the pandemic because the defendant had a recidivist criminal history including eight cocaine-related offenses despite receiving incrementally longer sentences, his offense involved violence (hitting a woman in the head with a hammer), and he had a substantial number of disciplinary reports (including fighting four times, possession of a dangerous weapon three times, possession of an unauthorized item three times, and, most importantly, misusing medications). 2020 WL 3913498, at *4. In *Smith*, regarded as a "close call," the Court granted release to a 59 year-old defendant with multiple, severe medical issues that placed him on dialysis and confined him to a walker despite his history of cocaine-related recidivism, history of extreme violence, and a 2015 disciplinary report for fighting, noting that defendant had otherwise performed well while incarcerated. 2020 WL 3913482, at *7. There, defendant had served approximately 16 years or 222 months after adjusting for good time credit. *Id*. Applying current guidelines, his advisory guideline range would have been 130 to 162 months or 250 to 282 months if defendant was given the maximum consecutive sentence for his sale of cocaine while on pretrial release. *Id*. Thus, the Court found that the time defendant had served was sufficient. *Id*.

The Court finds this case to be a close call as well. Although defendant has a recidivist criminal history related to cocaine akin to *Smith*, he has no history of violence and his prior possession of firearms is not particularly aggravating. His performance while incarcerated is also better than in either *Green* or *Smith* with nearly a decade of clear conduct and only one disciplinary report of note. Here, though, defendant's health

13

conditions, although they substantially increase his risk of severe outcomes from COVID-19, are not nearly as serious and debilitating as in *Smith*. Thus, although defendant's offense, criminal history, and disciplinary record are all less aggravating than in *Smith*, his health conditions are less compelling. Indeed, Smith's debilitating health conditions significantly decreased his likelihood and ability to commit future crimes. Here, defendant's health conditions are not so debilitating to prevent future criminal conduct.

Notable too is the fact that defendant is further away from having served a guideline sentence than the defendant in *Smith*. Defendant has served roughly 14 years or 168 months. Assuming he received a bottom of the range sentence and accrued full good time credit towards his term of incarceration, his sentence would be approximately 199 months or roughly 16.5 years. The question then becomes, in light of defendant's cited health conditions and his increased risk during the COVID-19 pandemic, whether the time defendant has served has fulfilled the goals of Section 3553(a).

The Court finds that it has. Were it not for the existence of a deadly pandemic, the Court would likely find otherwise. Defendant has significant health issues, though, which place him significantly more at risk to COVID-19 and his continued incarceration significantly increases the likelihood that he will contract the virus. If defendant were sentenced under the current guidelines and received full good time credit, he would have served the vast majority of his sentence by now. The utility of upholding the remaining few years of his adjusted sentence would be outweighed by the current threat to his wellbeing, particularly given that he has shown impressive rehabilitation over the last decade. His existing 14 years of incarceration have offered sufficient deterrence, promoted respect for the law, provided just punishment, reflected the seriousness of his offense, and protected the public. Defendant's remaining ten-year term of supervised release will be sufficient to deter him from reengaging in criminal conduct and will provide a swift means of reincarceration should he recidivate.

This Court has been cautious not to expand the compassionate release framework into a discretionary parole board wherein it can release a defendant merely because it disagrees with the sentence imposed. *See, e.g.*, *Crandall*, 2020 WL 7080309, at *6; *Green*, 2020 WL 3913498, at *5. This is not a case where the Court finds release appropriate merely because it might believe a life sentence is too harsh for the crime in this case. To the contrary, the Court must set aside whether it agrees or disagrees with the sentence imposed. Compassionate release is not a framework to simply resentence a defendant or a venue for a court to offer blanket reductions for sentences it disagrees with in the absence of some applicable relief from Congress. Here, release is warranted because defendant's health conditions place him at a substantially higher risk of death or serious illness during the pandemic and the goals of Section 3553(a) have been fulfilled by the time defendant has already served. In sum, the Court arrives at its conclusion not out of disagreement with the sentence imposed but by following the set standards of compassionate release.

Thus, the Court finds that the Section 3553(a) factors favor release. The Court, however, requires further information about defendant's release plan. He states only that he plans to live with his cousin, a healthcare worker, who can offer a stable living environment and that defendant's family is ready to offer support. (Doc. 144, at 11, 22–23). The Court requires further information to ensure that defendant's cousin's home is suitable for defendant's transition back into society, e.g. whether defendant's cousin has any criminal history, whether there are firearms present in the home, whether there are children present in the home, and so on. Information about defendant's plans for release would also be useful, such as intended employment or education.

### D. *Effect of Defendant's Pending Appeal of his FSA Motion*

In light of the above analysis, the Court would grant defendant's motion if defendant submits a supplement detailing his release plan to the Court. The parties appear

to agree, however, that the Court cannot grant or deny defendant's motion outright because of his pending appeal before the Eighth Circuit Court of Appeals on his FSA motion. (Docs. 149, at 4–7; 150, at 2–3).

Federal Rule of Criminal Procedure 37(a) allows a district court to indicate, among other things, that it would grant or deny a motion that it currently lacks authority to rule on due to a docketed appeal. Thereafter, the movant is responsible for notifying the appellate court of the district court's statement and the appellate court may remand for further proceedings in response. FED. R. CRIM. P. 37(b); *see also* FED. R. APP. P. 12.1.

Under Rule 37(a), the Court states that it would grant the motion if it had the authority to do so, assuming defendant submits the supplemental information requested.

## V. CONCLUSION

For these reasons, the Court **states that it would grant defendant's motion** if this case were remanded from the Eighth Circuit Court of Appeals and if defendant elaborates on his release plan. Defendant is **directed** to notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 of the Court's statement. If the Eighth Circuit Court of Appeals remands this case, defendant is further **directed** to supplement his motion with additional information about his release plan. If these two events occur and the Court is satisfied with defendant's release plan, the Court will grant defendant's motion and reduce his sentence to allow for near-immediate release.

**IT IS SO ORDERED** this 20th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa